UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,

                                        Plaintiff,

        v.

EDUARDO ALVAREZ, JR.,

                                        Defendant.

Case No. 3:19-cr-00048-MMD-WGC-1

ORDER

## I.    SUMMARY

Defendant Eduardo Alvarez, Jr. was indicted on a single count of felon in possession of a firearm. (ECF No. 1.) Defendant moves to suppress the evidence the government has collected against him, arguing his constitutional rights were violated in several ways warranting suppression, beginning with his initial encounter with Washoe County Sheriff's Office ("WCSO") Deputy Victor Gamboa pertinent to this case ("Motion").[1] (ECF No. 20.) As further explained below, the Court agrees with Defendant that Deputy Gamboa seized Defendant without the particularized reasonable suspicion required for an investigatory stop to pass constitutional muster. Further, because the Court agrees with Defendant on these broadest arguments, it will not reach all of the arguments he raised in his Motion. (*Id.* at 19-25 (making the arguments the Court will not address in this order).) And as all evidence in this case flows from Deputy Gamboa's unlawful detention of Defendant, the Court will order the suppression of all of the evidence the government has collected in this case.

_____

[1]The government filed a response (ECF No. 29), and Defendant filed a reply (ECF No. 33).

## II.     FINDINGS OF FACT[2]

The Court relies on the evidence filed by Defendant with his Motion, along with the evidence filed by the government with its response, including audio recordings of the pertinent 911 calls and video recordings of relevant body camera footage, to construct this factual background. The Court also notes that it only makes factual findings pertinent to the legal discussion that follows farther below.

At 8:54 p.m. on August 25, 2019 (ECF No. 29 at 2), T.W., who lives at the end of Dutch Flat Road in Sun Valley, Nevada—which borders open space in the desert hills— called 911 to complain about shooters up in the hills. (ECF No. 20-2, USAO 00097.) He guessed that people were shooting up on the nearby Chimney Road, after it turned to dirt, near some water towers. (*Id.* at 0:00-0:20.) As he identified on the call, there is Bureau of Land Management ("BLM") land up there, where recreational target shooting is permitted in certain places, depending on the type of weapon and the precise location. (*Id.* at 0:20-0:27; *see also* ECF Nos. 20 at 2, 4-6, 29 at 3-4, 33 at 2-3 (disputing the specifics, but generally agreeing the caller was describing an area managed by BLM where some types of target shooting is permitted).) T.W. asked that somebody be sent up there to 'shut the shooters down' because it was almost 9 p.m. on a work night. (ECF No. 20-2, USAO 00097 at 0:27-0:43.) He guessed there were at least five shooters. (*Id.* at 0:43-0:49.) He explained he was concerned about the shooting not just because of the noise, but because it was fire season, and he thought that anybody who, like the shooters, would still be up there shooting after dark probably did not have a fire extinguisher, or was otherwise not taking the proper precautions to prevent wildfires. (*Id.* at 1:01-1:53.)

---

[2]*See* Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). Defendant argues, and the government does not dispute, that an evidentiary hearing is unnecessary because the relevant facts are not disputed and are captured on the submitted recordings. (ECF No. 20 at 1 n. 2; ECF No. 33 at 1.) The Court agrees that the essential facts are captured on the recordings, rendering an evidentiary hearing superfluous.

He concluded the call by saying he would be willing to sign a noise complaint about the shooting, giving his name and contact information, and again asking that the dispatcher send someone up there to check it out. (*Id.* at 1:53-2:38.)

At 9:01 p.m., a female caller who refused to identify herself also called 911 to complain about shooters up in the hills, and asked for something to be done about them. (ECF No. 29 at 2.) Like T.W., she also guessed the shooting was coming from the dirt portion of Chimney Road. (ECF No. 20-2, USAO 000100 at 0:23-0:35.) She could not say how many shots she had heard. (*Id.* at 0:35-0:55.) She also was not sure what type of guns were being fired, and had not seen any people, or vehicles containing people, she thought were doing the shooting. (*Id.* at 1:40-1:55.)

At approximately 8:54 p.m., Deputy Gamboa was dispatched to Chimney Road to investigate the report (presumably T.W.'s, based on the time) of target shooters in the area. (ECF No. 20-5 at 6.) Deputy B. Johnson was also dispatched to the same general area to investigate. (ECF No. 20-4 at 3-4.) Deputy Gamboa had been patrolling in this general area for about two years at the time, and was familiar with the Chimney Road area specifically. (ECF No. 29-3 at 2.) He was aware that people frequently target shoot in the area, but that shooting close to occupied dwellings is restricted, and was aware that target shooting in that area can cause wildfires. (*Id.*)

Deputy Gamboa drove out to the dirt portion of Chimney Road to the water towers referenced in T.W.'s call, and then kept driving. (ECF No. 20-5 at 6.) About a half-mile past the water towers, he encountered three men standing by two Chevrolet trucks, one black Chevrolet Avalanche, and one white Chevrolet 3500. (*Id.*) He stopped his WCSO vehicle and got out. (ECF No. 20-6 at 0:41-0:48.) He yelled to the men, "What's going on guys?" (*Id.* at 0:48-0:50.) Then he yelled, "You guys are stuck?" (*Id.* at 0:50-0:52.) The men's reply to both questions is inaudible. Next Deputy Gamboa asked, "You guys shooting out here at all?" (*Id.* at 0:48-0:50.) The men reply, "Nah." (*Id.* at 0:50-0:51.) Deputy Gamboa proceeds to ask them if they have any guns or weapons on them,

3

explaining that he "just needs to know," and stating that he does not care if they do. (*Id.* at 0:52-1:05.) "Just be honest with me," Deputy Gamboa says, "I just need to know who I'm talkin' to, you know what I'm saying?" (*Id.* at 1:05-1:07.) The men's response is not audible, but they seem to indicate they do not have any guns. (*Id.*)

Deputy Gamboa then repeats that he needs to know if the men have any guns because WCSO has gotten calls that people have been shooting in this area, and people do not normally come this far up the dirt portion of Chimney Road. (*Id.* at 1:08-1:22.) The man in the black sleeveless shirt (Defendant) replies that actually, he rides ATVs up here a lot. (*Id.* at 1:23-1:27.) That prompts Deputy Gamboa to ask the men if they have seen anyone riding ATVs in the area that day. (*Id.* at 1:25-1:27.) The man in the white t-shirt responds that, yes, actually, they had seen about four men riding ATVs. (*Id.* at 1:28-1:31.) Deputy Gamboa responds with a question; "Have you seen anybody shooting out here, have you heard any shots?" and then confirms the men said they had heard some shooting, but they weren't sure how many shots or how many shooters they heard by repeating it back to them. (*Id.* at 1:31-1:40.) Deputy Gamboa then asks, "is it just you guys out here, just you three?" and then seems to confirm they replied yes, because he says, "alright." (*Id.* at 1:41-1:43.)

Deputy Gamboa takes a few steps closer to the men, and then says, "Okay you guys, just for right now, just do me a favor, just keep your hands where I can see them— don't be reaching in your pockets or towards your waistbands, or nothing like that, alright?" (*Id.* at 1:44-1:50.) The men stand there. Deputy Gamboa then spends the next 50 seconds talking into his radio as he watches three sets of headlights come down the dirt road towards him. (*Id.* at 1:50-2:40.)

The first vehicle to reach Deputy Gamboa is an ATV ridden by a man in a pink button-down shirt, with a dust mask on. Deputy Gamboa shines his flashlight at the man and says, "Stop right here, bro." (*Id.* at 2:40-2:42.) For the following 12 minutes or so, Deputy Gamboa focuses his attention on the second group of men including the man on

4

the ATV (the "Second Group"), and Defendant and the two men who presumably were driving the white Chevrolet truck (the "First Group")[3] continue to stand where they are. (*Id.* at 2:42-14:00.) However, at a little before five minutes after Deputy Gamboa switches his body cam on, Defendant appears to ask he if can go, and Deputy Gamboa explains he cannot. (*Id.* at 4:48-5:18.) He instead tells Defendant that he is going to try and get him out of here as soon as he can. (*Id.*)

In those 12 minutes he focuses on the Second Group (*Id.* at 2:42-14:00), Deputy Gamboa stops all three vehicles making up the Second Group: the ATV, a green Toyota 4Runner, and a gray truck with another ATV in the back. (*Id.*) He eventually makes all four men in or on these three vehicles get out of them and sit separately in the dirt. He frisks and handcuffs the man on the ATV. (*Id.*) He questions the man on the ATV about whether the man has a gun, and after initial denials, perhaps due to confusion about whether Deputy Gamboa asked the man if he had a gun on him, or had a gun at all, Deputy Gamboa gets him to admit that he has a nine millimeter handgun under the seat of the green 4Runner. (*Id.*) During these 12 minutes, other deputies, most notably Deputy Johnson, also arrive. (*Id.*) Deputy Gamboa takes IDs from all four men in the Second Group and hands them off to another deputy, who runs the criminal histories of the four men in the Second Group. (*Id.*) He and Deputy Johnson thoroughly search both the green 4Runner and the gray truck with the ATV in the back. (*Id.*) They eventually find the nine millimeter handgun in the green 4Runner, and find out the man in the pink button-down shirt who arrived on the ATV is wanted on an outstanding warrant for failure to pay a fine. (*Id.*)

///

---

[3]Defendant later explains on video that he did not know the other two men, and had stopped to try to pull them out when he encountered them. (ECF No. 29-9 at 10:47-11:00.) This also appears to have happened not long before Deputy Gamboa arrived.

Around 13 minutes and 15 seconds into the bodycam recording, Deputy Gamboa asks the man in the pink button-down, "why you guys out here shooting in the middle of nowhere?" (*Id.* at 13:15-13:17.) The man starts to explain something about how a motorcycle got a flat, but Deputy Gamboa orders him to sit down in the dirt while telling the man that Deputy Gamboa knows he's been shooting, and that he's been drinking, because the man has red, watery eyes, and Deputy Gamboa found a case of Modelo (beer) in the 4Runner. (*Id.*)

Once the man in the pink button-down is sitting in the dirt, Deputy Gamboa happens to be looking towards Defendant, who is standing where he has been the entire time Deputy Gamboa has been interacting with the Second Group—in front of his black Chevrolet Avalanche, on top of a small knoll. Defendant must have said something to him, because Deputy Gamboa yells to Defendant, "What's that?" (*Id.* at 14:04-14:06.) Defendant repeats his question. (*Id.* at 14:06-14:07.) Deputy Gamboa responds, "Give me a sec, bro, I'll get you guys here in a minute. Can I pat you guys down? [...] I know you guys told me you don't have any guns, but I just want to make sure. You guys have been super cool with me, so I'm a try'a keep it cool with you guys, you know what I mean? You guys have been nothing but respectful, so I appreciate that." (*Id.* at 14:07-14:25.) Defendant and the two other men making up the First Group continue to stay where they are, and do not move.

About thirty seconds later, another officer, who Deputy Gamboa identifies as "Sarge," approaches Deputy Gamboa. (*Id.* at 14:50-14:51.) Deputy Gamboa explains to Sarge that the First Group is probably unrelated to the Second Group, which contains the suspected shooter—the man in the pink button-down. He relays that the First Group said the white Chevrolet truck got stuck. Deputy Gamboa tells Sarge he's probably just going to pat the First Group down, check their IDs, make sure they do not have guns, and then get them on their way. (*Id.* at 14:51-15:08; *see also id.* at 15:45-16:02.) Deputy Gamboa explains that the Second Group matches the description that Deputy Johnson put out (of

6

the group suspected of target shooting who rode away from Deputy Johnson when he first encountered them), and gives Sarge various reasons why he thinks the Second Group is the group of suspected unauthorized target shooters he was called out to investigate. (*Id.* at 15:08-15:45.)

A few seconds later, Deputy Gamboa finishes talking with Sarge, and approaches the First Group. (*Id.* at 16:34.) Over the course of the next 17 minutes or so, Deputy Gamboa eventually discovers that Defendant's Chevrolet Avalanche contains three firearms (the firearms referenced in the indictment), a knife, and a case of ammunition. (*Id.* at 16:35-33:13.) During this time, Deputy Gamboa also pats Defendant down, takes his ID, runs it, and learns he is a felon. (*Id.*) Defendant initially denies that he has any firearms several times, but eventually admits he does when Deputy Johnson makes multiple passes around his Chevrolet Avalanche, finding first a case of ammunition and then the barrel of an assault rifle by shining his flashlight into the truck—and after Deputy Gamboa confronts Defendant with what Deputy Johnson saw. (*Id.*; *see also* ECF No. 20-5 at 6-7) Eventually, Deputy Gamboa places Defendant under arrest. (ECF No. 20-6 at 32:30-35.) After asking Defendant if they can look in his truck, Deputies Gamboa and Johnson extensively search through Defendant's Chevrolet Avalanche. (*Id.* at 38:07-45:55.) Nobody ever read Defendant his *Miranda* rights that night. (*See generally id.*)

## III.   DISCUSSION

Defendant challenges his initial detention, arguing that all evidence flowing from that illegal detention should be suppressed. The Court agrees that Defendant was seized within the meaning of the Fourth Amendment from the inception of his interactions with Deputy Gamboa, and that Deputy Gamboa lacked the requisite particularized, reasonable suspicion for the seizure within the framework of an investigatory stop.

### A.   Seizure

Defendant argues that he was seized from within seconds of the beginning of his interaction with Deputy Gamboa, because Deputy Gamboa nearly immediately asked him

7

to keep his hands where he could see them, repeatedly confirmed he was not free to leave, and nobody in Defendant's circumstances would have believed he was free to leave. (ECF No. 20 at 17.) The government counters that the interaction between Deputy Gamboa and Defendant was consensual, and Defendant could have left at any time. (ECF No. 29 at 9-12.) The Court agrees with Defendant.

"Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Fla. v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 19, n. 16 (1968)). Said otherwise, "[s]o long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." *Id.* (internal citation omitted).

Here, Deputy Gamboa did not use any physical force on Defendant, or at least not until much later in their interactions. (ECF No. 20-6 at 32:30-35 (putting Defendant in handcuffs).) Rather, he seized Defendant through his show of authority. And neither Defendant nor any reasonable person in Defendant's position would have felt free to disregard Deputy Gamboa and go about his business. Thus, Deputy Gamboa detained Defendant—or "seized" him within the meaning of the Fourth Amendment—from the beginning of their interaction.

The most helpful piece of evidence presented to the Court on this point is Gamboa's bodycam video. (ECF No. 20-6.) Shortly after encountering the First Group and before the Second Group approaches, Deputy Gamboa asked Defendant and the other two individuals to keep their hands where he can see them. (*Id.* at 1:44-1:50.) About three minutes later, Defendant appears to ask he if can go, and Deputy Gamboa responds he cannot. (*Id.* at 4:48-5:18.) He instead tells Defendant that he is going to try and get him out of here as soon as he can. (*Id.*) Moreover, about another 10 minutes later, Defendant seems to ask if he can leave (though it is hard to hear), and Deputy Gamboa tells him he cannot. (*Id.* at 14:04-14:25.) This is at least the second time that Deputy

8

Gamboa responded to a question from Defendant with an explanation he was not free to go. (*Id.* at 4:48-5:18.) These retroactive confirmations that Defendant was not free to leave show Deputy Gamboa seized Defendant from the beginning of their interaction. (ECF No. 20 at 17 (citing *U.S. v. Black*, 707 F.3d 531, 538 (4th Cir. 2013) ("The verbal directive from the officers not to leave was not the initiation of the seizure, but rather an affirmation that [the defendant] was not free to leave.") (finding that the defendant was seized and investigating officer lacked reasonable suspicion to initiate a *Terry* stop)).)

The government's response brief (ECF No. 29 at 9-12) ignores these exchanges where Deputy Gamboa tells Defendant he is not free to go, and thus, the government's characterization that there were two, separate but consensual encounters between Deputy Gamboa and Defendant is unpersuasive in light of the totality of the circumstances revealed through the Gamboa bodycam video. Moreover, other indicia beyond Deputy Gamboa telling Defendant he was not free to leave also point towards the Court's conclusion that he was seized from the beginning of his interaction with Deputy Gamboa.

For example, the First Group does not really move for the 12 minutes in which Deputy Gamboa is detaining the Second Group. If they felt they were free to go, they may have continued trying to pull the white Chevrolet 3500 out, and may have also left. (ECF No. 20-6 at 0:00-14:04.) But they did not. Further, the First Group continues not to move after Deputy Gamboa tells them they cannot, until he starts directing their movement, and they consistently comply—beginning with allowing Deputy Gamboa to frisk them. (*Id.* at 14:25-17:05) Thus, the most reasonable interpretation of Deputy Gamboa's bodycam footage is that Defendant, and the other two men making up the First Group were detained from the beginning of their first interaction because they did not think they were free to go.

Further, neither Defendant, nor a reasonable person in his position, would have thought he was free to leave for the additional reason that he witnessed Deputy Gamboa's

escalating display of authority as Deputy Gamboa detained the Second Group. (*Id.* at 2:42-14:00.) To elaborate, Deputy Gamboa asserts his authority over the Second Group as Defendant watches by detaining the Second Group, beginning by ordering the man in the pink button-down on the ATV to stop, asking him questions, frisking him, and eventually putting him in handcuffs. (*Id.*) He also orders the other three members of the Second Group to sit in the dirt while he gets the ATV driver to admit he has a handgun in the green SUV, takes all of their IDs, and searches both the SUV and the truck with the ATV in the back. (*Id.*) This escalating display of authority would also suggest to Defendant he was not free to go because the Second Group was not, and they were also under Deputy Gamboa's control.

Finally, the commands phrased as questions that Deputy Gamboa issued to Defendant (and the rest of the First Group) both before and after he detained the Second Group would also suggest to Defendant he was not free to go. First, Deputy Gamboa asked Defendant to keep his hands where he could see them, and not make any sudden movements, before turning to the Second Group. (*Id.* at 1:44-1:50.) While he phrased his request as a question, Deputy Gamboa did not indicate Defendant was free to say no. And as discussed above, when Defendant inquires a few minutes later, Deputy Gamboa explains he was not free to go, removing any ambiguity that may have existed. (*Id.* at 4:48-5:18.) Second, after Deputy Gamboa finished with the Second Group, Deputy Gamboa had the First Group submit to being frisked. (*Id.* at 14:04-14:45; *see also id.* at 16:20-19:00.) Though Deputy Gamboa phrased his frisk request as a question, he does not say that Defendant and the other two men making up the First Group were able to decline his request, and having watched Deputy Gamboa detain four other men, frisk them, and search their vehicles, Defendant would not reasonably think he was able to. In sum, Deputy Gamboa detained Defendant from around the time he first encountered him.

///

///

10

**B.    Investigatory Stop and Reasonable Suspicion**

Having found that Deputy Gamboa seized Defendant from the beginning of their interactions, Deputy Gamboa had to have "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot[,]'" *U.S. v. Basher*, 629 F.3d 1161, 1165 (9th Cir. 2011), for his investigatory stop of Defendant to pass constitutional muster under *Terry*. "In deciding whether a stop was supported by reasonable suspicion, the Court must consider whether 'in light of the totality of the circumstances, the officer had a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* Said otherwise, "[a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *U.S. v. Cortez*, 449 U.S. 411, 417 (1981) (citation omitted). "The 'reasonable suspicion' necessary to justify such a *Terry* stop depends 'upon both the content of information possessed by police and its degree of reliability.'" *Foster v. City of Indio*, 908 F.3d 1204, 1213-14 (9th Cir. 2018) (citation omitted). "In applying this standard, we take into account the 'totality of the circumstances.'" *Id.* at 1214 (citation omitted).

Here, the government points to four factors in support of its argument that Deputy Gamboa reasonably suspected Defendant had committed the misdemeanor crime of unauthorized target shooting: (1) he was dispatched on a call for service from two different 911 callers, one of whom agreed to identify himself, complaining of shooting in an area about a half a mile from where he encountered Defendant; (2) he knew some types of target shooting were not permitted in the precise location where he encountered Defendant; (3) only about 15 minutes had elapsed from the call for service when he first encountered Defendant, and he could infer based on the white truck being stuck that Defendant had been there for at least 15 minutes; and (4) he was concerned about the risk of unauthorized target shooting starting a wildfire (a public safety concern). (ECF No. 29 at 13-16.)

///

11

The problem with the government's argument is that only parts of factors (1), (2) and (3) are at all particularized to Defendant—and all turn on Defendant's location. Beyond where Defendant was located at the time Deputy Gamboa encountered him, nothing particularly points to Defendant having a gun or that he was shooting.[4]

To start, it is clear from Deputy Gamboa's bodycam video that Defendant is not shooting or holding any sort of gun when Deputy Gamboa first encounters him. (ECF No. 20-6 at 0:00-1:50.) In their first two minutes of interaction, Defendant and the other two men making up the First Group tell Deputy Gamboa, in response to his questions, that they have not been shooting, and do not have any guns. (*Id.*) They also say they had heard some shooting, and had seen some men on ATVs who might have been shooting. (*Id.*) They also explain that they are trying to get the white truck unstuck. And the white truck does look stuck. (*Id.*) None of this suggests Defendant had a gun.

Further, the information Deputy Gamboa learned from the Second Group pointed towards them being the shooters he was dispatched to look for, and thus even farther away from a reasonable suspicion Defendant had a gun. In the 12 minutes Deputy Gamboa focuses on the Second Group, Deputy Gamboa and Deputy Johnson—again, one of his colleagues who arrives on the scene—learn that the second group of men with the ATVs have at least one gun they were not initially forthcoming about. Deputy Gamboa also appears to conclude that the man on the ATV was the one shooting (ECF No. 20-6

---

[4]Of course, Defendant did have a gun in his Chevrolet Avalanche. He had three guns, one of which is an assault rifle. He also had at least one knife in his truck, and an entire case of ammunition. But just because Deputy Gamboa's hunch was correct, that does not mean his initial investigatory stop of Defendant was constitutional. *See, e.g.*, *U.S. v. Grigg*, 498 F.3d 1070, 1083 (9th Cir. 2007) ("There is a traditional and constitutionally preserved interest in personal security from governmental intrusion, which fuels the requirements that the police obtain warrants before making an arrest and that police have reasonable suspicion that criminal activity is afoot before making a *Terry* stop."); *see also id.* at 1081-83 (finding investigatory stop was not supported by reasonable suspicion and was thus unconstitutional).

at 13:15-13:17)—and he tells Sarge that while also characterizing the First Group as probably unrelated (*Id.* at 14:50-16:02). Thus, as Defendant argues (ECF No. 20 at 9-11), it is unreasonable that Deputy Gamboa persisted in detaining Defendant, and later insisted on patting him down and searching his truck, where Deputy Gamboa appears to have already accomplished his mission in responding to the call for service when he identified the man on the ATV as the person who had been shooting guns. Deputy Gamboa's intervening detention of the Second Group of men seemed to provide an alternate source for the target shooting Deputy Gamboa was investigating. This does not add, and instead detracts, from any reasonable suspicion that Defendant had a gun.

Moreover, neither Deputy Gamboa nor Deputy Johnson's police reports (ECF Nos. 20-4, 20-5) provide any explanation regarding why they suspected Defendant of having a gun, or why they detained him for an extended period of time. *See, e.g.*, *U.S. v. I.E.V.*, 705 F.3d 430, 437 (9th Cir. 2012) (affirming the district court's factual finding that a police officer's justification for a frisk, that the defendant was nervous, was not credible when it was not included in his police report prepared closer in time to the frisk). They essentially say that they were responding to a call for service about gunshots, detained Defendant, and eventually found his guns. (ECF Nos. 20-4 at 3-5, 20-5 at 6.) The reports are missing the crucial explanation of why they detained Defendant in particular.

While the government does provide an after-the-fact affidavit (ECF No. 29-3) in which Deputy Gamboa explains that he knew people often went target shooting in this area, and that it was unlawful to shoot a firearm that was not a BB gun or shotgun in the spot he encountered Defendant, this evidence does not offer any particularized reasonable suspicion that Defendant had a gun at the beginning of his interaction with Deputy Gamboa. At most, it shows that Deputy Gamboa had a right to question anybody he encountered at this particular spot about target shooting. And Deputy Gamboa did that. But Defendant answered that he had not been shooting. Nevertheless, Deputy Gamboa detained Defendant for about another half hour before Deputy Johnson saw

13

ammunition in the backseat of Defendant's truck by shining his flashlight into it. This was the tipping point, where Deputies Gamboa and Johnson confronted Defendant, and he eventually admitted he did have guns in the car—after again denying it. But setting what eventually happened aside, Gamboa's affidavit does shed any light on why Deputy Gamboa suspected Defendant had a gun when he initially encountered him.

The government also points to the 911 calls (ECF No. 29 at 13-16), but those too contain no information particularized to Defendant. As described above, the 911 calls (ECF No. 20-2) are from two residents who had been hearing gunshots for the last several hours, and wanted the police to go make the gunshots stop. Neither caller said anything about the type of gun being fired or who was shooting them—nor, realistically, could they. They were hearing gunshots in the distance from their houses. The callers guess the gunshots are coming from the area up the dirt road by the water towers, as both appear to know that is an area where people often go shoot guns. But nothing in the calls points to Defendant as the source of the gunshots. This distinguishes this case from cases discussing whether 911 calls contributed to reasonable suspicion, where the reliability of the 911 call tends to turns on eyewitness knowledge, or specific information about a particular person that the police confirm when they arrive on scene. *See Foster*, 908 F.3d at 1213-17 (discussing the factors the Ninth Circuit considers in weighing whether a 911 call gives rise to reasonable suspicion justifying an investigatory stop). Here, the 911 callers were not eyewitnesses of any crime, and the 911 calls contained no information particularized to Defendant. (ECF No. 20-2.)

The government also discusses the valid public safety purpose of the call for service—preventing wildfires—which was also a reason the 911 callers cited when they requested the call for service. (ECF No. 29 at 13-16.) There is no dispute that preventing wildfires is in the public interest, and important. But nothing about a desire to prevent wildfires makes Defendant uniquely suspicious in the absence of any initial evidence he was shooting guns. This argument is therefore mostly beside the point.

14

1    In addition, the government relies on *Basher*, 629 F.3d 1161, to argue that Deputy

2 Gamboa reasonably suspected Defendant had a gun from his first interaction with

3 Defendant. (ECF No. 29 at 13.) However, the investigating officers in *Basher* had much

4 more information—much more particularized to Basher—than Deputy Gamboa had about

5 Defendant here. Specifically, they had been camping while off duty the night before, heard

6 shooting all night, and were able to pinpoint the location the shooting was coming from to

7 a nearby campsite they were familiar with. *See Basher*, 629 F.3d at 1163. The next

8 morning, they checked into duty and decided to go investigate. *See id.* One of them saw

9 a box of shotgun shells in Basher's truck, in plain view, as he arrived, before they even

10 encountered Basher. *See id.* They both also saw a fire ring with a fire still smoldering in

11 it before they encountered Basher, and knew that fires were prohibited in that location.

12 *See id.* at 1164. Thus, the investigating officers in *Basher* had much more information

13 suggesting the people in the tent they approached were doing something unlawful by the

14 time they announced themselves, and Basher and his son came out of the tent, than

15 Deputy Gamboa had about Defendant when he first encountered him.

16    Really all Deputy Gamboa had was a hunch that somebody in the spot he found

17 Defendant could have been the source of the shooting the 911 callers had reported. And

18 even though *Terry* is not a high standard to meet, Deputy Gamboa did not meet it here.

19 Without something linking Defendant in particular to the reported gunshots, the

20 government cannot show the requisite "objective manifestation that *the person stopped*

21 is, or is about to be, engaged in criminal activity." *Cortez*, 449 U.S. at 417 (emphasis

22 added). Such evidence simply does not exist here.

23    In sum, because Deputy Gamboa seized Defendant without the reasonable

24 suspicion constitutionally required to initiate an investigatory stop, the Court will grant

25 Defendant's Motion. And as the Court is granting the Motion, the Court need not reach

26 Defendant's other arguments.

27

28                                                             15

1    Moreover, the Court agrees with Defendant that all evidence collected in this case

2  flows from the initial unlawful detention. (ECF No. 20 at 18-19; *see also* ECF No. 33 at

3  2.) Notably, the government does not argue for any sort of partial suppression remedy in

4  its response. (ECF No. 29.) And the Court finds that one would not be warranted. The

5  Court will therefore suppress all of the evidence collected by the government in this case

6  as the fruit of the poisonous tree rooted in Deputy Gamboa's seizure of Defendant without

7  the particularized reasonable suspicion required by *Terry* and its progeny. *See, e.g.*, *U.S.*

8  *v. Washington*, 490 F.3d 765, 776-77 (9th Cir. 2007) (finding that suppression of firearm

9  was warranted as fruit of the poisonous tree even where the defendant later consented

10  to a search of his car because the police officers' initial stop lacked reasonable suspicion).

11  **IV.    CONCLUSION**

12    The Court notes that the parties made several arguments and cited to several

13  cases not discussed above. The Court has reviewed these arguments and cases and

14  determines that they do not warrant discussion as they do not affect the outcome of the

15  issues before the Court.

16    It is therefore ordered that Defendant's motion to suppress (ECF No. 20) is

17  granted. All evidence collected by the government in this case is suppressed.

18    DATED THIS 21st day of April 2020.

19

20  _____

21  MIRANDA M. DU
   CHIEF UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28                                16